Drive, this court is now in session. Please be seated. Would the clerk call the next case, please? 3-22-0105, Ramona L. Ory, appellant by Michael Lichner, v. City of Naperville, Illinois, in an old body, aptly by Kristen Hoberman. Thank you. Um, Mr. Lichner? Good morning. You got it correct, Judge. Good morning. May it please the court, my name is Michael Lichner and I represent a very nice woman by the name of Ramona Ory, who is the plaintiff and the appellant. Is the court aware Ms. Ory's cause of action stems from personal injury, serious personal injury she sustained on January, I'm sorry, July 8th of 2017. She was walking with friends in the busy downtown Naperville Riverwalk area crossing the Main Street Bridge on the northwest corner specifically. At approximately 11.40 p.m. she placed her left foot on the edge of the bridge she thought was an adjoining sidewalk. Her foot descended, fell, and sustained a left hip fracture that required emergency surgery. The standard of review in this case is de novo because the trial court granted defendants motion for summary judgment, and improperly, because there were genuine issues and material fact that precluded summary judgment. Namely, the trial court improperly weighed conflicting evidence regarding the city's actual and constructive notice. The trial court also erred in finding that the one and a half inch drop at issue was de minimis and disregarded the aggravating factors that were present. The court also erred in failing to admit Google Earth images that showed that the defect at issue had existed continuously since at least August of 2012. Finally, the city is not immune because it had a sidewalk inspection program because that inspection program was no inspection program at all. In fact, evidence reveals that the sidewalk at issue had not been inspected since 2005 when the Main Street Bridge was rebuilt. Turning to the court's improper weighing of the conflicting evidence, the trial court disregarded the Google Earth images, even though the date stamps on the Google Earth images indicate that that defect had been present since at least August of 2012. Moreover, the trial court disregarded the city's own employees, its own engineers, Marino and Hines, who testified unequivocally the sidewalk and the bridge had not been inspected since 2005. The city's own interrogatory number 19 admitted the sidewalk and the bridge had not been inspected since 2005. The trial court also disregarded the inferences that the city closed the sidewalk at issue just nine months prior. Not adjoining sidewalk, the sidewalk at issue, the one that caused Missouri to fall. The trial court then accepted a retired engineer for the city's testimony unequivocally, namely that on September 9th of 2015, when he was conducting an IDOT mandated bridge inspection, he supposedly looked at the adjoining sidewalks and in one note, it says sidewalks okay. The court disregarded the fact that the deck of the bridge was constructed out of the very same pavers as the adjoining sidewalk. Therein lies a reasonable inference that jurors could reach differing inferences about what sidewalk specifically he was talking about. If you look at Kozurek's testimony and all of his documentation, it relates specifically to the bridge and with minutia. I would submit to the court that his inspection was focused on the bridge and not the adjoining sidewalk. Moreover, he could not answer, even though he was the inspector, why the sidewalk had been closed by the city in 2016, nine months prior. With respect to the issue of constructive- Counsel, you said the sidewalk was closed by the city. Where is that appearing there? In the Google Earth images- There's a photo of the closed sidewalk site. Yes, Your Honor. Where do you get that the city closed it? When pressed, I asked Mr. Kozurek to explain who would have the authority to close the sidewalk. He obviated between he wasn't sure, but the city typically does that. I would submit to the court that it's unreasonable that a third-party contractor, without the knowledge of the city, would be able to close a municipal sidewalk, specifically in a downtown area, crossing a very prominent bridge. And if I can follow up on that, because the sidewalk was closed, you presume- Because the sign said sidewalk closed, you presume that it was the sidewalk, even though it was in the street. Is it possible that the street was being repaired and that's the reason that the sidewalk was closed? No, because I don't think that's a logical inference. I think it's the former. Even though the street physically appears in the roadway, I guess on the shoulder of the bridge of the roadway, it refers specifically to the sidewalk. It literally says sidewalk closed, and it's adjacent to the sidewalk at issue. Counsel, there's a fundamental evidentiary question here, which is the foundation that was laid for the Google Earth map. And I'm troubled by the lack of authority in your brief for the court taking judicial notice of the Google Earth map without any more substantive foundation being laid. I understand your concern, and the concern is a concern of modern evidence being taken into account and the law perhaps being behind the times in this area specifically. As I cited in the brief, law enforcement, governmental agencies, and normal people typically and routinely rely upon Google Earth images. In fact, on the issue of de minimis, the Barrett court, which was a first district court, specifically relied on Google Earth images, albeit for a slightly different analysis. But if you dig back into the case like I did over the weekend, the Barrett court specifically reviewed Google Earth images that were marked during the course of the deposition, just like in this case. And in that case, they said not only were the defects fairly sizable, but there were multiple defects throughout the parking lot. And they used that in their analysis to say, hey, look, these defects should have been fixed. And in part, they're not de minimis, in addition to other aggravating factors. So we do actually have courts of review analyzing Google Earth images, albeit perhaps maybe not exactly in the same context. But I'll submit to you these Google Earth images are even better. They lack no indicia or no indications that they're untrustworthy. And in fact, like a periodical, like a newspaper, they're date stamped by Google. Google has no reason to do things wrong, because if they did, people would not trust the search engine. People would not trust the corporation. So when the car drives by, like it did in this case, and it's taking photographic evidence, those date stamps occur because they're printed when the images are taken. And I would submit to you they have no reason to fake or to lie or to be inaccurate about their date stamps, for all the reasons I've articulated, including navigation, photographic evidence, which is routinely used by law enforcement in accident reconstructions and used by governmental agencies. Do you have any obligation to show that the city actually saw the Google Earth photos? I don't follow you on that. Well, are you arguing that if something is out there in the ether, it provides notice to the city without any indication that the city ever looks at Google Earth? The answer would be yes. It's constructive notice, because it's open, it's obvious, and it's apparent. And it existed for a period of years. So you can see the case law focuses on a temporal issue. And Arvidson versus City of Elmhurst being the seminal case, in that case, only a year was sufficient. There was a shopkeeper that said, yeah, I've seen this defect in the sidewalk. It's been there approximately a year. It was completely uncontested. And in that case, it was enough. In this case, we have years of evidence. And I would submit the city never inspecting that area since 2005 is willful blindness. They can't then say, because something comes along, in this case technology, that establishes unequivocally the defects are there and have been present. Well, we don't look at Google Earth. We don't review those things. Therein lie the crux of the issue. With respect to actual notice, I think that's in the Google Earth image, the fact that the city shut down the sidewalk, or the inferences that the city shut down the sidewalk nine months prior. Why? They could not explain. But there's evidence that they actually took those steps. And as the case law indicates, if one of your employees does something or sees the defect, they're charged with at least actual notice that it exists. Now, with respect to the de minimis argument that kind of dovetails into this, the court essentially disregarded all the aggravating factors and said the defect, because it's one-and-a-half inches, is de minimis as a matter of law. That's not the state of the law in Illinois. As they pointed out to the trial court in Al-Qaeda versus standard parking, that defect was a mere three-quarters of an inch. And the court found it was actionable because, number one, there was poor lighting, and number two, the defect, which was a small deviation between concrete slabs on a wheelchair ramp, was masked by the color. Now, the trial court seized on this and said, well, Mr. Lichtner, the bridge is concrete, it's white, the pavers are red. As I pointed out to the court, the defect itself, the drop-off, as opposed to a step-up, was masked by her direction of travel northbound. Meaning, as she's walking towards the defect, it simply drops away. It's not something you can appreciate as a height variation. Instead, it drops off. Her and the two people she was with that day all testified unequivocally that it was a dimly-lit area right near the end of the bridge. In addition to that, the third aggravating factor that the trial court declined to notice was that this was an area that was likely to be encountered by pedestrians. In fact, Naperville advertises for its folks and other surrounding residents to come shop in downtown Naperville. This is a heavily-traveled area in downtown Naperville. The city's own program, supposed sidewalk program, also demonstrates that it was not de minimis. The city's program mandates that if there are adjoining slabs of concrete or sidewalk or surface that are to be walked upon and the deviation is one inch or greater, must be replaced. When the city actually came out after it was sued and did an inspection, not only the northwest corner had to be replaced because it met the criteria, but all four corners of the bridge. Going back to constructive notice, the fact that all the photographic evidence before on Google Earth, and even if this court didn't consider the Google Earth photographs, all of the immediate post-occurrence photographs, including the city's photographs, are consistent. They show a concrete edge of the bridge that's chipped, that's worn from people's feet, and other things striking it. Why? Because the pavers had sunk down. This wasn't a recent phenomenon. This wasn't an isolated phenomenon. This was something that was structurally wrong. Koshurik, who the city relies upon for the rest of this argument, even admitted the city knew that these pavers were susceptible to the freeze-thaw cycle and sinking. What's the city do after it's sued? For the first time ever, it goes out because the city law department says, go out, inspect this. They inspect it, it meets the criteria, immediately temporarily fixed, and within months, permanently fixed. In this case, Ms. Orr's fall was entirely preventable. If the city had simply done its job and inspected its sidewalks, these downtown, heavily-traveled sidewalks, this would not have occurred. Thank you. Are there any questions for Mr. Lichtner? No, thank you. Thank you, Mr. Lichtner. Ms. Toberman, good morning. Good morning. May it please the Court, my name is Kristin Toberman. I'm a senior assistant city attorney with the city of Naperville. It is nice to be in a courtroom. Again, actually, the last time I was in a courtroom was arguing the motion for summary judgment on this case. Everything else I've done over Zoom. There's kind of a lot to unpack based upon what Mr. Lichtner had just said, but I'll kind of start at the beginning. We are governed by the Tort Immunity Act. We have a duty to maintain our property, and we are not liable for injury unless we have actual or constructive notice of a defect, of a condition that is not reasonably safe. So notice is extremely important. Notice is the kind of end-all, be-all in sidewalk cases, because that applies. I mean, obviously, if it's de minimis, then we're immediately out. It's not actionable. But notice, if it's not de minimis, then notice kicks in. And the plaintiff has to, at the motion for summary judgment stage, he had to have had some evidence, some facts, to meet all of the elements of his claim. So he had to have facts, not speculation, not conjecture, not inferences, that we had notice. The allegations of notice are based upon Google Images. There is a huge problem with Google Images. And you have copies of Google Images in the briefs. I would ask you, if you looked at that, are you able to tell what the measurement of any sort of defect is based upon the Google Image? No. You can't. I can't. You can't. No one can. So to say that this defect was consistent from 2009 until the date of when she fell is not supported by any evidence. You simply can't see that. We are talking about minutia. The height of the defect when she fell, at most, was one and three-eighths inch. There is no way to determine height in any of the Google Photographs. That is one of the main reasons why the court did not consider those. You cannot do that. If this court were to allow the use of Google Photos in every trip and fall case, and say, hey, look at this photo, it kind of, sort of, maybe looks like there is a defect, that would 100% change the landscape for every single municipality who has to defend these cases. It would put a tremendous burden on us to have an employee scanning, reviewing all of these Google Earth images every single day. That's just an unreasonable request that can't simply even be considered. The other avenue that the plaintiff argued that we had actual notice of the defect is the Google Earth image from 2016, which, again, there's no foundation for how these photos were taken. He stood up here and told you how it was taken. But, again, that's not in the record. There's absolutely nothing in the record about how Google takes these photos. That photo shows a sidewalk closed sign in the road. There is nothing in that photo that shows the sidewalk was actually closed. So then to say that, A, it was the city that closed the sidewalk, what facts support that? There are no facts to support. The sign doesn't say, City of Naperville, sidewalk closed. There are no photos of a person wearing a City of Naperville shirt putting that sign on the road. There's no indicia that Naperville put the sign there or that that sign was actually meant to close the sidewalk. That photo should not even be considered by the judge in the summary judgment proceeding because there's no foundation for that photo, period. That does not show we had actual notice. The witnesses that were deposed from the city stated that we have a sidewalk inspection program. We inspect sidewalks when roads are resurfaced and when we receive any sort of complaints or concerns about sidewalks. Counsel, did you present any case law that would suggest that your program, like a program in another case, was adequate, was acceptable, was sufficient in an objective sense to be a proper inspection program? I could not find any case where a court had weighed upon a sidewalk inspection program and said, here is an inspection program that is sufficient. I think that argument is still very much out there. What is an inspection program? The inspection program really kind of goes to defeat the constructive notice arguments. If we have a program and we don't find it in the program, then that means that we don't have constructive notice. The interesting fact in this case is that the fall happened at the very edge of a bridge. We have to inspect bridges. We took an engineer who had retired from the city, been there 30 years. He knows all about sidewalks, very familiar with the program, our sidewalk program, what to look for. There's three criteria to replace sidewalks. A differential of an inch or more is one of the criteria. He is doing all of the things he needs to do to inspect the bridge. He has boots on the ground walking around inspecting the bridge. He's looking at the sidewalk on top of the bridge, and he specifically states he's looking at the adjacent sidewalks right off the bridge. He notes in his report, he writes, sidewalks, okay. When asked in the deposition about that, what do you mean by that? He says, I meant that there were no sidewalks that met criteria for replacement by the city. Therefore, when he inspected the sidewalk in September of 2015, any defect that was there had to be under an inch. He stated if it had been an inch or more, he would have reported that to the city. That then would have triggered the sidewalk inspection based upon a complaint about the city. Was counsel correct when he said that in Regulatory 19, the city admitted that 2005 was the last inspection? Under our sidewalk inspection system, yes. There is a specific department and people in that department who do sidewalk inspections. They inspected it before the road was resurfaced in 2005. They had not received any other complaints about the sidewalk since then. Therefore, they did not go back out and inspect it. So 12 years under that program approximately. Under that program, right. But we did have the unique situation of a bridge inspector who knew about it, who knew what to look for. He looked at the sidewalks and he doesn't see anything that meets our criteria, which means it had to be under an inch. That's really kind of uncontroverted. There is nothing to controvert his testimony regarding that. Mr. Lickner mentioned in his brief that he didn't write down any of the measurements for the sidewalk, but he did write down a lot of other measurements for the bridge inspections, bridge inspection components. And Mr. Pazuric stated that in order to rate the sidewalk according to the IDOT standards, you have to have measurements on certain areas of the bridge. So that's why he wrote certain measurements. So we don't have notice of the defect. We don't have actual notice of the defect. We don't have constructive notice of the defect. But the defect in itself, the court was correct in granting summary judgment when the court found that this defect was actually de minimis, when it was at most one and three-eighths inch. So the de minimis rule really stems, again, from municipalities who have miles and miles and miles of sidewalks and a huge economic burden to keep them completely perfect and defect-free. We don't have to keep them perfect, and it alleviates our duty to go out and make sure everything is smooth. We know we're in northern Illinois. It's cold. We have freeze-thaw cycles. These outdoor sidewalks are going to move. They're going to deteriorate. I see your steps outside are having some issues, right? It's probably from the weather over the years. But sidewalks, actually, the case law actually states that sidewalks are built in slabs because they're designed to move. They're designed to expand and contract with the weather. They're not going to stay perfect. So we don't have to be hyper-vigilant to make sure our sidewalks are perfect. If there's a de minimis defect, it's not actionable. The court found that that one and three-eighths defect was de minimis. It was supported. There is case law out there that absolutely supports a one and three-eighths defect being de minimis. That would be Burke v. Quincy. In that case, that was one and seven-eighths de minimis. St. Martin v. Hospital Group, the defect was between one and a half and one and three-quarters. Morris v. Ingersoll, the defect was one and a half. So the court certainly had sufficient legal authority to determine that the defect was de minimis based upon the maximum height of one and three-eighths inch. Now, let's talk about the issue of lighting for a second. Because there are over 14 pages of photos in the record just showing pictures of light posts. The bridge itself has six lights on the bridge. There are photos showing lights on buildings across the street on two separate restaurants in Naperville. There are two streetlights across from where she fell on Chicago and Maine. Counsel, are you suggesting that the presence of a light post means it's well lit? Absolutely. Yes. Yes. Because Mr. Lickner said that the witnesses stated it was dim. And I'm stating that, first of all, that there was a lot of light out there. However... A lot of lights. Lights. Light is a different concept than lights, right? How bright those bulbs are is what's going to determine. Where they shine is going to determine. Right. And that's a measurement that doesn't seem to be part of the record. It's not part of the record. But, Your Honors, you don't even have to consider the lighting. If you find that the defect is de minimis, the second district in Putnam v. Bensonville stated that if a defect is de minimis, there is no requirement for a municipality to install lighting over an otherwise not actionable defect. And if there was a requirement to put lighting over otherwise not actionable defects, that would substantially undercut the purpose of the de minimis rule, right? And so if you have a defect that is de minimis, but at nighttime it's not de minimis, then guess what? We have to put lighting everywhere along every single de minimis defect. That's really not the purpose of the de minimis rule, which is to recognize the huge economic burden on cities to maintain and keep these sidewalks in good, well, we have to keep them in good condition, but to not have every single sidewalk defect be actionable. The Google Images point I just want to raise, I see my time is running out. Google Images can be used by the court for very limited purposes in judicial notice. They can be used for geographic info, information that's undisputed. They can be used for distance between locations to measure that. They can be used for assistance with a deponent or witness to kind of understand what they're talking about. That's not what he's asking you to use them for. He's asking you to use Google Images to measure with your eyeballs the height of a defect. That simply cannot be done. You might have the best vision in the world, but you cannot measure a defect, on a Google Earth image. So for all of those reasons, Judge, we would ask that you affirm the order of the trial court, granting the motion for summary judgment in favor of the city of Naperville. Are there any additional questions for Ms. Fogerman? Thank you. Thank you. Mr. Lettner, rebuttal. Counsel would lead you to believe that if you simply exclude the Google Earth photographs, then the city has no liability. That is certainly not the case. There are pieces of evidence that the trial court, I think, in my estimation, improperly disregarded. But even if this court lended no credence to the Google Earth photographs, plaintiffs still should win. And this is why all the post-occurrence photographs, including the photographs that were taken the day after Mrs. Orey fell, when Ms. Chimora put her eyeglasses in the defect, are consistent over time. The inference is that it existed over time and the defect was stable. The measurements are stable over time. Mr. Moreno, who goes out and measures it, over an inch. Our investigator, Mr. Kenia, who goes out and measures it in this particular case, is an inch and a half, most likely where she fell. Ms. Chimora's eyeglasses, like the eyeglasses that all of your honors are wearing, are in the defect the day after it fell. All those photographs are stable. Counsel would lead you to believe that this simply happened for no apparent reason shortly before and the city had no notice. The city had no notice because it was willfully blind. By its own admissions, it conducted no inspection of the sidewalk at issue. We're not talking about in a far-flung, sleepy residential area. We're talking about in the busy downtown district. What happens? After they have actual notice, this is very telling, actual notice, her friends go to the police department. They say, our friend fell last night. She's seriously injured. She's undergoing surgery. Please close the sidewalk. It's dangerous. The police department says, we don't have any authority. We'll let the parks people know about it, but we can't do that. The city takes no action. Mrs. Ori gets out of the emergency room. She's non-ambulatory. She files a FOIA request. Guess what? She obtains what the city never produces, which is video surveillance of the fall of that very night. The city said in court, it didn't happen. It didn't exist. She sent the FOIA request to the city because she was non-ambulatory. The officer actually drove the surveillance video to her house. Guess what? The city takes no action. Only after the city is sued on May 1st of 2018, does the city law department say, hey, we got a problem. Mr. Marino, go out there. He goes out there on May 24th of 2018. So how is this relevant other than to show that they didn't take action after knowing about your client's fall? It's relevant because it goes to their inspection program, which is essentially nonexistent, that even when given actual notice of a defect, the city fails to act. It says it has no constructive notice, but it doesn't have constructive notice because it closed its eyes. It didn't inspect the area for 12 years. Then after there's actual evidence that somebody was injured, hey, you guys have a problem, it does nothing. As it relates to the same question I asked opposing counsel, you started your argument earlier today, inspection program was inadequate. I didn't see any case law on either side that kind of was on all fours, but with an argument that it was adequate or inadequate. Do you have any other arguments on that? I realize that it's not there. It's not there. So it's simply just reading the plain language of the statute, and it's an either-or. That the city, if it had a program and it wasn't discovered, and it was reasonably adequate, considering the practicality of the cost of the inspection, weighed against the likelihood and the magnitude of the potential danger, or the public entity in this case says that it has an inspection program, that inspection program has to be reasonably adequate, and it has to be administered with due care. And then and only then, if they don't discover it, they're supposedly immune. In this case, it's not reasonable, and they didn't exercise due care. 12 years isn't due care. And after having actual notice that somebody was injured and not going out and doing anything about it, points to the inadequacy of the program. With respect to Kosherik's bridge inspection, I think reasonable minds could differ about what he was talking about. All of his measurements, even down to millimeters, were focused on the bridge itself. The bridge deck is made out of the exact same pavers as the adjoining sidewalk. I think those are material issues of fact that a jury has to resolve. With respect to the city's interrogatory, it was not qualified. It said that it had not inspected the bridge since 2005. Thank you. Thank you, counsel. We thank both of you for your arguments this morning. We'll take the matter under advisement and we'll issue a written decision as quickly as possible. The court will now stand and briefly session.